When you're ready, Counsel. Good morning, Your Honors. My name is Philip Seplow, and I'm here to try and get Roland Terry Armstrong, well, optimally his case dismissed, but at least a new trial. I'll probably reserve four or five minutes for the end. I've got the clock here, so I'll make it my duty to watch it. I'd like to start with the non-factual part of my argument first. It's the reasonable doubt argument. And as I've been doing my CJA service for a while and doing state court service for a while, it sometimes appears to me that this very important standard of reasonable doubt gets shortchanged through the trial system. It would appear to me that if you make a statement about reasonable doubt, and that statement is not incorrect, that the trial court should at least allow the defendant to have that as a written instruction. The words I'm talking about are, if on the other hand you think there is a real possibility that the defendant is not guilty, you must give him the benefit of the doubt and find the defendant not guilty. Well, okay, but the court does have the responsibility to correctly advise the jury. Yes, Your Honor. But then repeating favorable parts to one side or the other then can be interpreted as an emphasis on the court's part. I really want you to, as opposed to focusing on the instruction as a whole and what the law is, I really want you to focus on the not guilty part of it. Well, when you say focusing on the favorable part, I would say focusing on the real part, because that is what reasonable doubt is. In my brief, I talk about down the street. I'm from Maricopa County. You get that in the state court. I did get it once with Judge Martone in the federal court and to a pretty good result. But I will tell the court that he was on the Arizona Supreme Court that made that particular instruction, I guess, mandatory for the state courts. It would seem to me when the court says favorable, well, maybe collaterally it is favorable, but if it is a statement of the law and it is something that's so inviolate of what a defendant, what does a defendant have when he comes to court these days? Not very much. Well, as a former trial judge, it would seem to me that you would have to first tell me that I was wrong in the instruction, that the first instruction was not adequate. And so if I instructed them, because any time you continue to instruct, I think most people that have been in the trial court know that you start getting confusing as far as that goes. So you want to probably give as few instructions as possible but the correct ones. Sure, I understand that. But what I'm at least putting forth to this court is I believe that is a correct statement and I believe that the entire system of justice, judges, prosecutors, defense attorneys, have this obligation to ensure that when a defendant comes before this body, that the body knows that they can do something, that it's fair. The problem I have with your argument is that, one, the district court gave the Ninth Circuit model instruction, right? Yes, Your Honor. Two, that instruction has been approved by our case law as adequately setting forth the reasonable doubt instruction. Absolutely. So that being the case, what you're asking us to do is to ignore Velazquez and the other cases that says this is adequate. No, I think I'm asking the court to do better and I don't mean that in an impudent way. I mean that in a way. Asking us to what? To do better. Well, it's not asking us to do better. You're saying we have to say that the district judge made a mistake by following Ninth Circuit law. No, I'm not asking you to say he made a mistake by following Ninth Circuit law. I'm asking you to say that he made a mistake by not. I'm sorry. The instruction he gave was completely in accord with Velazquez, which approved the instruction. I agree with you. So how can it be a mistake? I'm saying that he made a mistake by not allowing the defendant to have the instruction that he wanted. Case law says you don't have to give any more. Well, maybe. How can we say that he made an error in light of our case law? Well, maybe the case law can change. That's all I'm asking. I'm asking you to consider it. That is what you're asking, isn't it? Yes, Your Honor. Absolutely. And you know we can't do that as a three-judge panel. It's something to think about in the future. We could write an opinion that contains a gentle hint that it would be a nice idea to amend the model jury instruction to include your sentence. That would be good. Okay, now let me get to the facts of the case. I just felt that that was important to bring up. Okay, thank you. I guess typically you probably start with the beginning of the case, which is what happened to the victim. All I'm going to say in that regard is I think both sides briefed what the victim testified to at trial. Very, very little to Terry Armstrong. She asked Terry for a ride home. He was there, and that was about the end of it. She said that as far as the sexual assault that she received, she was passed out. She felt something in her buttocks. That was about it. And then the next day she woke up, her bra was on backwards, her pants were dirty, she was soiled, and she had a pain in her private parts and her butt. That's the extent of the evidence. The reason why I think there should be a reversal, at least a remand, is because Mr. Armstrong is convicted on his statement. Now, I know that the judge and Judge Wake is a compassionate gentleman, and I know that he gave great deference to Special Agent Romager and DPS Officer Resnick, but I think he totally ignored Leona Hawthorne, who was reputed of mother-in-law, the mother, I believe, of Olivia Cain. I know that Judge Wake discredited Olivia Cain's testimony, saying she was excited but didn't believe it, and I guess to some degree discredited Roland Terry Armstrong's testimony. But here we have a Native American. This is an event that happened a year and three quarters ago. As I think described by Olivia Cain, two white men come up onto the Native American reservation. They are holstered. They are law enforcement agents. They want to talk with Terry. Terry says that he goes to the car because he thought he had to. The agents say that he went to the car because he wanted to not be questioned in front of his folks. Regardless, when you look at the totality of the circumstances, it's been brief, so I don't have to say too much. I think in this case the court made a clear error in that Mr. Armstrong, as an objective Native American, thought that he was in a custodial situation and certainly he was interrogated. His Miranda rights should have been given to him. Well, what about they let him go after he made the statement, right? Yes, they did. That's the strongest piece there to me, that it wasn't custodial. Because if, I mean, obviously if they had taken him and if they had arrested him after he said that, it might be hard to backtrack on that. But they let him go, even though he admitted certain things, right? Yes, that's one piece of the argument which would go against custodial interrogation. But I think you don't look at what happens later. I think you look at what happens at the time. And at the time, it's these two people, Caucasians taking the Native Americans, saying, We have to talk to you. We have to talk to you, according to Liana Hawthorne, shaking and yelling, shaking the finger, bringing him to the car. One side of the story, I understand. And if you look at that in an objective manner, and then Terry Armstrong saying, Well, I thought I had a talk with him. If not, they were going to take me somewhere else, take me somewhere else. Well, that's against his free will, so I would call that custodial. Okay. Now I want to jump to the situation with the polygraph. This is a trial now, and I guess I'm cross-examining, or trial counsel, I should say, is cross-examining Special Agent Rominger of the FBI. And he wants to know why one of the co-defendants, Mikey James, was given his Miranda rights. Obviously, the strategy at this point is the defense has two bites of the apple, and will try to convince the jury that any statements he made were involuntary. Agent Rominger starts talking about the polygraph. There's a meeting objection. The judge does give a, quote, curative instruction. But at that point, I think what happens is the jury thinks, Oh, my goodness, this person says he'll take a polygraph, so he'll get his rights. Okay, one way or the other. But Terry Armstrong wouldn't take a polygraph. Now, I don't think there's anything but a negative connotation to that. One person says I'll take a polygraph, gets his rights, and the jury doesn't know what happened to him, obviously. And then Mr. Armstrong, the only inference is that he didn't take a polygraph because he wasn't read his rights. And I think that's an incredible amount of prejudice, which is impossible to overcome. I know that the government says that counsel invited it. In the colloquy between counsel and Mr. Johnson, the AUSA, and Judge Wake, he said something to the point. He was asked, I think Mr. Johnson says it's in the discovery, and I think counsel says yes, but that was certainly not on my mind. The point was getting to this why someone's given a right and why not. And no matter how it gets up, and even if it's tinily invited by undersigned counsel, but I don't think it was, it's just put such an aura of prejudice on the case, I don't see how a juror can forget about it. Then you dovetail that into the last thing that Mr. Armstrong is arguing, at least in this area, where the prosecutor basically said Mr. Armstrong could have told you different, but he didn't. Those are not his words, and I can pull the words out if you need me. Mr. Armstrong could have told you different, but he didn't. Now, the government says it's because we put on a case. We didn't put on a case on that issue. There was one witness called by the defense. It was Olivia Cain, just to talk about the setting of the initial, well, I'm not going to call it arrest, but taking of Terry Armstrong to the government vehicle, and that was it. Olivia Cain was not privy to any conversation, not whatsoever. So the only person who could refute what the FBI says that Mr. Armstrong said is Mr. Armstrong. They didn't tape record his conversation, so you can't hear what he said, and I don't think there's any other way to look at it, but the prosecutor says that Mr. Armstrong didn't take the stand and refute what was said, and that's, I think it's blatant, and I think that requires a remand. The last argument, and I've given myself a few more minutes before I reserve, if that's okay, and this is a little more problematic, goes to the evidence and the statement, and is there enough evidence to convict Mr. Armstrong without the statement? And I will grant the government that there is a case that basically talks about the core violation and then the foundation of the statements, where the statement's okay. But in this particular case, it's more than a core violation because you have multiple actors, multiple actors, and if this case had gone to trial with some of these multiple actors, I think I cite the Ninth Circuit jury instruction in here, which talks about you have to look at each defendant separately. Well, we're not doing that because the government chose, or maybe because the police or whatever, tried Mr. Armstrong by himself. So, okay, there is evidence that Rena Johnson was assaulted. She felt something in her butt after she passed out, and the next day she was disheveled and had pain. But the core evidence has nothing to do with Terry Armstrong except for the fact that he had a motor vehicle, and that's why I think the statements, whether they're coerced or not or whether they're non-Miranda or not, is not enough to sustain the sufficiency of evidence, and I'll reserve some time. Thank you. Thank you. And now we'll hear from the government. May it please the Court, Joan Rufinock, appearing on behalf of the United States. Unless the Court would like a different order, I'll take the issues in the order raised in the briefs. With regard to the Miranda warnings, the flaw in the defendant's argument, I think, as he admits, is that the testimony of the defendant and his girlfriend, Ms. Cain, was rejected by the district court. The court expressly, as a matter of fact, rejected that testimony, and the court did so in a very thoughtful manner. If this court takes a look at the record, the hearing occurred on December the 14th. By that afternoon, the district court issued a written order, and that's at pages 103 and 104 of the supplemental excerpts or of the excerpts of record. In that order, the court said, I carefully listened to the testimony and determined the plausibility of that testimony in light of all the circumstances known to me and the manner in which the witnesses testified. After doing so, the district court concluded that the agents who testified were the more credible witnesses, and he accepted that credibility, and in assessing their testimony, found that it clearly showed that the defendant was not in custody at the time that he made the statements. And specifically, the court found that the defendant voluntarily walked to the vehicle. The defendant was asked to talk about an incident that happened a while ago, and he agreed to do so. That it was at the defendant's request that he sat in the police vehicle because he didn't want to be overheard by those that were up on the porch, that the defendant was not confronted with any specific information about the offense that had occurred, and that the defendant was never restrained in any way, and that he was free to go after the 15- to 25-minute interview. And I'd submit that based on those findings by the district court, Would he have been free to go in the middle of the interview? There's no reason to believe that he would not have been because he was specifically told after he had given the written statement, You are not under arrest. You don't have to talk to us. And I'd submit that on those facts, clearly the defendant was not in custody. With regard to the reasonable doubt instruction, as this court noted, the instruction that was given was the Model Ninth Circuit instruction, which has been approved in Velazquez. Defendant complains not that there was any error in the instruction that was given, but that he wanted his preferred language. He's not entitled to his preferred language, and I'd submit that it's clear from the record Were you the trial attorney? No, I was not. Does your office have a policy of objecting to his sentence? It's a pretty good sentence. Not that I'm aware of. But I would submit Is it an erroneous statement of law? No. But I think that it does, if you add that to the instruction, that's the Model Ninth Circuit instruction, then it does give, it makes the instruction more one-sided in favor of the defendant. But I'd submit to the court that one thing the district court did not do How can an accurate statement of the law, when adding that sentence, make it, I mean, I read the entire instruction, and I simply disagree with you. It's obvious that we have approved the instruction. That's all I'm saying. But adding a sentence does not seem to me that it makes it one-sided in his favor. I think that it, because it says it twice. Because what the Ninth Circuit instruction says is that if, on the one hand, you have a doubt based on reason, then you should find the defendant not guilty. And then if you add to that, so if there's a possibility that he's not guilty,  you're, in effect, repeating a concept that's already within the Ninth Circuit-approved instruction. And in any event, the district court in no way restricted the argument of counsel. So had counsel wanted to make that argument, it would be a correct argument, and certainly it would lend itself to being argued with the instruction that was given. The only point that I think is missed, if you leave his out, is the instruction that's now written is entirely written in terms of if you find what a reasonable doubt is, but you're not given any way of figuring out what isn't a reasonable doubt. His sentence is the only one that says, well, if there's a real possibility he's not guilty, then there's no reasonable doubt. If you don't put that in, the only thing that's said over and over again is you have to find a reasonable doubt. But the jury doesn't have a sort of a thing to bump up against as to, well, okay, how do I tell? What's the definition of? Well, based on reason and common sense. So I'd submit that if it's not based. It's not reversible on this ground. But I think out of the government's sense of fairness, I don't see a particular reason to object to the sentence. And I don't know, I think that the only basis for objection on the record is we prefer the Model 9 circuit instruction because it's been approved. With regard to the polygraph issue, the only, the government agrees that, or the negative inference that's drawn from the fact that Michael James agreed to a polygraph, or let me back up. The way that, the reason that this response even came in on redirect examination is that on cross-examination, confusion was created. The question was asked by defense counsel, and I guess an officer has a choice under the law whether or not to give the rights if they're talking about one thing when he's in custody for another, and you decided to give him the rights. Answer, right, after he was in custody. Well, that confuses two issues because when the defendant's in custody, or when a person is in custody, he's entitled to Miranda rights. And that was stated over and over again throughout the trial. So it was clear to the jury that if a person's in custody, they're entitled to Miranda rights. But then we have something thrown in about choice. Well, the choice doesn't really come in as to whether or not you Mirandize him. It comes into the assessment of if he's in custody on something else, are we allowed to go in Mirandize him? And if he's willing to speak with us, speak about it. Aren't these all legal issues anyway? I mean, you know, unfortunately, trial lawyers often try to get into legal issues and make the jury think that they have something to say about this, which I don't see how the jury wouldn't be deciding. It wouldn't matter whether the jury thought he was in custody or not, right? Because, I mean, the court's already made a determination on whether the statement comes in. That's true. The court's made the legal decision. But, again, it goes to the voluntariness and how much weight the jury should give the statement that was made. Now, but not with regard to Michael James, because Michael James didn't testify. I mean, he's a completely different defendant. Or he wasn't even a defendant in this case. He was not charged in the indictment in which the defendant was charged. But did I— So, but is the jury deciding voluntariness? Only in the sense of determining how much weight to give a particular statement. Because under the instructions that are given— They're not really deciding legal voluntariness. Not legal voluntariness. They're just deciding whether they believe he said what he meant what he said or what— How much pressure was he under when he made the statement? Should we accept what he said, or did the agents unduly pressure him to make that statement? So to that extent only. But the government submits that there would only be— The negative inference to be drawn from the mention of a polygraph is that the defendant was offered an opportunity to give a polygraph. An inference that, oh, he must not have agreed to take one. And a further inference that if he agreed or if he declined to take a polygraph, he must be guilty, and he doesn't want to admit to it because the polygraph would make him admit to it. Now, that is only a negative inference if the defendant does not make an inculpatory statement, which he made in this case. He already said, I did it, according to the testimony of the agents and according to his written statement. So there's no further prejudice that could, excuse me, inure to the defendant in this case. And in any event, the district court took the curative actions of instructing the jury to disregard that statement and to pay no moment to it. And under that circumstance, there was no prejudice to this defendant. With regard to the sufficiency of the evidence, defendant is seeking to read a third prong into the Lopez-Alvarez test. Because all Lopez-Alvarez tells us is that there has to be corroboration before a defendant's admissions can be or statements can be admitted into evidence. There has to be corroboration that the crime actually occurred and corroboration of the trustworthiness of the statements that were made by the defendant. And the government submits that, in this case, the testimony of the victim establishes both of those prongs. Well, it seems to me that the arguments are getting a little bit conflated here. That let's say if the victim, alleged victim, as it were, testified and there was no admission entered in. All right, you evaluate the sufficiency of the victim's testimony on one standard. Now, but the standard that we're looking at here is whether that testimony that she gave was sufficient to be corroborating testimony under another standard. So you could say, on the one hand, if it had only been the victim's testimony and there had been no other evidence, that might have been insufficient to convict Mr. Armstrong. But on the other hand, the standard that what's sufficient corroborating evidence of an admission for the admission to be admissible,  Correct. Correct. All right, do you see any conflating that's going on here in the argument? Well, what I would submit is that if we're looking at the issue of is there sufficient evidence to establish that the defendant was, in fact, a perpetrator? Because that's what defendant is complaining. There's nothing that shows that I am the one. And I'd submit that under Lopez-Alvarez, that the trustworthiness prong of the test actually considers, although not explicitly, that factor. Because in order to be trustworthy, the statement has to give sufficient detail to indicate that this person committed the crime. And in Lopez-Alvarez, as in this case, there were multiple actors who were charged with the offenses. And in Lopez-Alvarez, despite the fact that there were multiple actors who were involved in the kidnapping, the torture, and the other charges, the court didn't graft on any additional proof requirements or corroboration requirements with regard to identity. And I'm not sure if that answers the court's. Thank you. With regard to the final issue that was raised in the briefs, the government submits that first the statement that was made was in direct response to an argument made by defense counsel. Because defense counsel argued at SCR page 114 that there was no proof of, quote, what was actually said, unquote, in the interview. And contrary to defense counsel's assertion, they did put on a case. And the case that they put on was the testimony of Olivia Cain. The purpose of putting on the testimony of Olivia Cain was to undermine the credibility of the agents who testified regarding the defendant's two statements, the written statement and the oral statement, that Ms. Cain testified that the interview process was much more confrontational than as represented by the agents. So in response to that defense and defense counsel's statement that there was no proof of what was actually said, the government argued that, first of all, you've got the written statement. And the written statement, no one disputes, says what it says, and that it was written, in fact, by the defendant. Counsel then goes on to argue that in the oral statement, there's no evidence to refute that he said what Agent Rominger says he said and Agent Grislock says he said. I'd submit that that's a very convoluted statement. It comes in the midst of, as I say in the brief, a multiple-page argument in which the point the prosecutor attempted to make over and over again is, number one, even if you had a tape, defense argument would still be there that you don't know what outside pressure was put on the defendant before, after or during the tape recording to get him to say what he said or to get him to write what he wrote. And in addition, that in any event, it's up to you, jury, in light of the evidence that was presented, to weigh the credibility of the witnesses and to determine which of the witnesses you believe. That's an entirely proper argument. And the government submits that this one convoluted sentence in the middle of that proper argument was not enough to prejudice the defendant because it was an indirect comment on the defendant's not testifying at trial. In any event, the district court instructed not once but twice in order to limit any potential prejudice that could possibly arise from that statement, and the government submits that in light of that curative action, which was taken within just a few pages of the statement having been made, that no prejudice would have inured to the defendant. Okay. Thank you very much. Rebuttal? I think I'm only going to talk about the statement where the prosecutor says there really is no evidence to refute that he said what Agent Rominger says he said or what Agent Resnick says that he said. I think it's patently clear that the only person who could have done that would have been Terry Armstrong. The instruction that the jury got concerning, quote, voluntariness, unquote, is you have heard testimony that the defendant made a statement. It is for you to decide, one, whether the defendant made the statement, and two, if so, how much weight to give to it. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the defendant may have made it. That's the only reason that Olivia Cain was brought on, to just talk about the surrounding incident, not to talk about what he actually said. And I just don't think you can allow a prosecutor to tell the jury when it's the government who has the ability to make a tape recording. There's certainly, I mean, he's driving suburban. A suburban is, you know, $20,000, $30,000. A tape recorder is $30. The government has the opportunity to just run the tape. Then you can, you know, it would be wonderful, because then defense attorneys could play the tape for the client and say, I know you told me you didn't say it, but here's the tape of what you said. I'll never forget, I mean, since I have some time, the very, very first trial I ever did, it was a long, long time ago, was a DUI in a city court, and the officer said A, B, and C. Well, I had a videotape of the officer talking to my client, and I didn't know what I was doing, but I played the tape, and sure enough, it wasn't what the officer said. The kid was acquitted. Basically, you're putting Mr. Armstrong in a position where he has no choice, perhaps, but to make the Fifth Amendment right against self-incrimination and against not testifying a sham to some degree, because he's the only person who could go to the jury and say, I didn't say that. And when the prosecutor said there was really no evidence to refute that he said what Agent Romacher says he said and what Agent Greselich says that he said, that's what happens to Mr. Armstrong, and I thank you. Okay, thank you. We thank both counsel for their argument in this case. The United States of America v. Armstrong is now submitted for decision.
judges: Tashima, W. Fletcher, Callahan